UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**, Plaintiff, vs. **OMAR LAMAR COOPER**, Defendant. | 2:19-CR-20015-TGB <br><br> **ORDER DENYING MOTION TO SUPPRESS EVIDENCE** |

## I. Introduction

Omar Cooper is charged with two counts of felon in possession of a firearm in violation of 18 U.S.C. § 922. These charges stem from a search of two properties associated with Mr. Cooper, one of which is his personal residence (the "Nottingham House"), and the other is a house he owns and from which he allegedly conducted sales of crack cocaine (the "Berkshire House"). Mr. Cooper contends that the search of the Nottingham House was unconstitutional because the affidavit supplied in application of the search warrant "did not provide probable cause that the home would contain evidence of a crime." ECF No. 16, PageID.42 (citing U.S. Const. amend. IV). Accordingly, Mr. Cooper seeks to suppress the evidence seized from the Nottingham House as "fruits of an unlawful search." ECF No. 16, PageID.43 (citing *Wong Sun v. United States*, 371

U.S. 471, 484 (1963)). Mr. Cooper does not contest the search of the Berkshire House.

**II. Background**

As Mr. Cooper notes in his motion, nearly all of the facts recounted in the affidavit supporting the warrant pertain to the Berkshire House. In the section titled "Probable Cause," Special Agent Dent provides 15 paragraphs of information in support of her application for the search warrants. ECF No. 16-2, PageID.63–73. Of those 15 paragraphs, only three deal with the Nottingham House. ECF No. 16-2, PageID.72–73. The other 12 paragraphs focus on activities at the Berkshire House, providing ample probable cause to support a search warrant for that location. For this reason, Mr. Cooper does not challenge the warrant for the Berkshire House. Rather, he contends that the three paragraphs about Nottingham House are insufficient to establish probable cause to search his personal residence.

In Paragraph 18, SA Dent says that a confidential informant ("DPD-1") "understands" that Mr. Cooper uses the Nottingham House to "cook" narcotics. ECF No. 16-2, PageID.72. DPD-1 says that this information is based on conversations with Cooper, but DPD-1 did not say that he or she personally witnessed Mr. Cooper or anyone else cooking narcotics in the Nottingham House. ECF No. 16-2, PageID.72.

In Paragraph 19, SA Dent says that at some time in November 2018, DPD-1 "personally observed a digital scale and a Pyrex jar

(commonly used to cook crack cocaine) with white cloudy residue located in the kitchen [, as well as] multiple large chunks of crack cocaine on the kitchen counter next to the digital scale and Pyrex jar" at the Nottingham House. ECF No. 16-2, PageID.72. SA Dent says that DPD-1 "observed COOPER place large chunks of crack cocaine inside of a plastic bag inside" the Nottingham House. ECF No. 16-2, PageID.72.

In Paragraph 20, SA Dent states that "agents conducted surveillance of [Nottingham House]." ECF No. 16-2, PageID.72. During that surveillance, according to SA Dent, an agent "observed the dark gray Ford F-150 backed into the driveway[,]" and SA Dent says that the vehicle was similar to one seen at the Berkshire House previously being driven by the Defendant. ECF No. 16-2, PageID.72–73.

Both homes were searched on December 19, 2018. ECF No. 18, PageID.88. A return[1] is attached as an exhibit to Mr. Cooper's motion, showing numerous items that were apparently seized during the searches. ECF No. 16-2, PageID.84–85. Those items include numerous firearms and ammunition, multiple cell phones, cash, a small quantity of what may be marijuana, six unidentified pills, two photographs of Mr.

---

[1] The return does not indicate the address from which these items were taken, and at the hearing before the Court, the Government did not know whether the Return showed items from both addresses or just one. Assistant United States Attorney Paul Kuebler later informed the Court and counsel for Mr. Cooper via email that the return attached to Mr. Cooper's motion shows only the items taken from the Nottingham House. The return therefore lists the evidence that Defendant is seeking to suppress.

3

Cooper, miscellaneous proofs of residence for Mr. Cooper, and $1,100.00 in cash. ECF No. 16-2, PageID.84–85.

### III. Argument

Mr. Cooper argues that the information in the affidavit relating to the Nottingham House is deficient. First, he argues that the information about the Nottingham House comes from an uncorroborated tip provided by an unnamed informant. ECF No. 16, PageID.47–52. Next, he argues that the information provided by the informant was stale at the time the affidavit was made, failing to provide probable cause of a "presently existing condition" at the Nottingham House. ECF No. 16, PageID.52–54. Lastly, Mr. Cooper argues that the evidence seized from the Nottingham House "must be suppressed because the agents did not rely upon the warrant in good faith." ECF No. 16, PageID.54–55. He claims that "the warrant affidavit so lacked the requisite indicia of probable cause that it was 'entirely unreasonable' for an official to rely on it." ECF No. 16, PageID.55.

The Government opposes this motion, arguing that "the facts that established that Cooper was a member of a continual and ongoing drug trafficking operation [make it] reasonable to conclude that he keeps evidence of his illegal scheme in his residence." ECF No. 18, PageID.95. The Government responds that "'facts showing that the residence has been used in drug trafficking' are not required to find probable cause" when a defendant is involved in a "continual and ongoing drug trafficking

4

operation." ECF No. 18, PageID.95 (citing *United States v. McCoy*, 905 F.3d 409, 417–18 (6th Cir. 2018); and *United States v. Brown*, 828 F.3d 375, 383 & n.2 (6th Cir. 2016)) (quotation marks omitted).

The Government notes that the affidavit relied on information from DPD-1 and also from information gained during a traffic-stop on December 12, 2018. ECF No. 18, PageID.96. In that stop—which appears to be unrelated to the investigation of Mr. Cooper—a woman passenger in the car informed police that she purchased drugs from the Berkshire House, that the Berkshire House is owned by "O"[2] (an alias for Mr. Cooper), and that "O" carried a gun on his person. ECF No. 18, PageID.96; ECF No. 16-2, PageID.69–70. She also provided a phone number for "O" to police. ECF No. 18, PageID.96; ECF No. 16-2, PageID.70. This information corroborated the tip from DPD-1, who also said that Mr. Cooper carried a gun, and who provided the same phone number for Mr. Cooper. *Compare* ECF No. 16-2, PageID.63 *with* ECF No. 16-2, PageID.69–70. The Government admitted at the hearing that no one had verified whether this number actually belonged to Mr. Cooper,

---

[2] The Government also points to an anonymous citizen complaint in September 2018 that stated a man known as "O" sold crack cocaine and heroin from the Berkshire House. ECF No. 18, PageID.93. However, this tip described "O" as "a black male, 5'10", 200 pounds." *Id*. In his Reply, Mr. Cooper says that he is actually 6'2" and 315 pounds. ECF No. 20, PageID.109. Four inches in height, and over a hundred pounds in weight between this description of "O" and Mr. Cooper's actual build create more doubt than certainty when it comes to connecting the anonymous citizen's complaint to Mr. Cooper. That Mr. Cooper owns the Berkshire House is undisputed however, and other witnesses also tell the police that they know the owner of Berkshire House by the nom de guerre, "O."

but that does not change the fact that two informants, independent of each other, supplied the same information when they were identifying Mr. Cooper.

The Government opposes Mr. Cooper's characterization of DPD-1 as an unreliable source, saying instead that DPD-1 had worked with the police before and had proven to be reliable. ECF No. 16, PageID.98. The Government also claims that because elements of DPD-1's tip were corroborated, DPD-1's veracity has been established. ECF No. 16, PageID.97–98.

Lastly, the Government argues that if there was a flaw in the showing of probable cause, the Good Faith Exception applies. ECF No. 18, PageID.99–101.

### III. Standard of Review

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no Warrants shall issue, but upon probable cause . . . describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV. The "chief evil" against which the Fourth Amendment protects is the "physical entry of the home." *Payton v. New York,* 445 U.S. 573, 585 (1980); *Thacker v. City of Columbus*, 328 F.3d 244, 252 (6th Cir. 2003). The right to retreat into one's home and "there be free from unreasonable governmental intrusion" is at the heart of the

Fourth Amendment. *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). "One of the touchstones of the reasonableness requirement is that the police must generally obtain a warrant based upon a judicial determination of probable cause before entering the home." *Ziegler v. Aukerman*, 512 F.3d 777, 785 (6th Cir. 2008). The job of the magistrate judge presented with a search warrant application is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The application must establish "a nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (internal quotation marks omitted). The magistrate or reviewing judge makes a probable cause determination using a "totality-of-the-circumstances" analysis. *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

The Court reviews the challenged warrant by "examining the information contained within the four corners of the affidavit[.]" *United States v. Dyer,* 580 F.3d 386, 390 (6th Cir. 2009). But line-by-line scrutiny of the affidavit is improper when reviewing the magistrate judge's determination. *See United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc).

## IV. Analysis

Mr. Cooper makes three arguments in support of his contention that the warrant for the Nottingham House lacked sufficient indicia of probable cause. First, he argues that the information about the Nottingham House came from an unreliable, unnamed informant. ECF No. 16, PageID.47–52. Second, he argues that the information provided by the informant was stale at the time the affidavit was made. ECF No. 16, PageID.52–54. Third, Mr. Cooper argues that the evidence seized from the Nottingham House "must be suppressed because the agents did not rely upon the warrant in good faith." ECF No. 16, PageID.54–55. The Court addresses each argument in turn.

### a. The Warrant Affidavit Showed that DPD-1 Was Reliable and DPD-1's Tips Were Corroborated

Mr. Cooper says that the Police relied on hearsay information from an unnamed confidential informant (DPD-1), and that "the Sixth Circuit 'demands that an affidavit demonstrates more than simply blind faith in the words of an affiant who claims his unnamed informant is reliable.'" ECF No. 16, PageID.47 (quoting *United States v. May*, 399 F.3d 817, 823 (6th Cir. 2005)). Mr. Cooper insists "there must be 'additional evidence that buttress[es] the informant's information' before the court can find probable cause." ECF No. 16, PageID.16–17 (quoting *May*, 399 F.3d at 824). Mr. Cooper says that it is not enough for unnamed confidential informants to be known as credible and reliable, generally, but their tips

8

must also be "corroborated by independent police work." ECF No. 16, PageID.48 (citing *United States v. Woosley*, 361 F.3d 924, 927–28 (6th Cir. 2004)).

In Paragraph 5 of her affidavit, SA Dent—the agent who signed the affidavit in support of the warrant application—stated:

> Detroit Police Department … has worked with DPD-1 in the past. Information from DPD-1 has led to the seizure of narcotics and several arrests. [Detroit Police Department] has found DPD-1 to be credible and reliable.

ECF No. 16-2, PageID.63. Mr. Cooper points out that neither SA Dent nor the Bureau of Alcohol, Tobacco, Firearms, and Explosives had any personal knowledge of DPD-1's credibility or veracity. ECF No. 16, PageID.49–50. Rather, he says that SA Dent's statement here is "based on hearsay information from the Detroit Police Department." ECF No. 16, PageID.49. Mr. Cooper says that "agents failed to corroborate any of the informant's information regarding Nottingham—that is, besides the fact that Cooper resides there." ECF No. 16, PageID.50. Mr. Cooper says that this, "by itself, is insignificant." ECF No. 16, PageID.50 (citing *United States v. Gibson*, 928 F.2d 250, 252–53 (8th Cir. 1991)).

Mr. Cooper is correct that DPD-1 is an unnamed informant who was unknown to the affiant herself. But the affiant was Special Agent Dent, an agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives, and SA Dent was working in concert with the Detroit Police Department

9

to investigate Mr. Cooper. The Detroit Police Department told SA Dent that they had worked with DPD-1 in the past, and that DPD-1's information had led to arrests and seizures of drugs.

The Sixth Circuit "demand[s] consideration of an informant's 'veracity, reliability, and 'basis of knowledge'" when dealing with information from an unnamed or confidential source. *United States v. Rodriguez–Suazo,* 346 F.3d 637, 646 (6th Cir. 2003) (quoting *United States v. Smith,* 182 F.3d 473, 477 (6th Cir. 1999)). But the Magistrate Judge was not demonstrating "simply blind faith in the words of an affiant who claims [her] unnamed informant is reliable." *See United States v. Ferguson*, 252 F. App'x 714, 721 (6th Cir. 2007). When SA Dent included that DPD-1 was an informant known to Detroit Police, and who had been used successfully by Detroit Police in the past, she did more than simply *claim* DPD-1 was reliable—she showed it. The Magistrate Judge considered that assertion in light of the other information in the affidavit, meeting the Sixth Circuit's demand for consideration of the totality of information about the informant's veracity, reliability, and basis of knowledge.

DPD-1's information was not just that Mr. Cooper was involved in ongoing drug sales from the Berkshire House and that he lived in the Nottingham House. DPD-1 also stated that Mr. Cooper carried a gun on his person and, that at the Nottingham House, DPD-1 saw "large chunks of crack cocaine on the kitchen counter next to the digital scale and Pyrex

jar," and that he personally observed Mr. Cooper putting large chunks of crack cocaine into a plastic bag. When DPD-1 proved himself trustworthy with his information about the Berkshire House—information which all appeared to be accurate—DPD-1's information about Nottingham House achieved also a higher level of believability. There is no requirement that police supply corroboration for every element of information provided by confidential informants, particularly when the informant is known to them, and has demonstrated him or herself to be trustworthy and accurate in their tips.

### b. The Information Was Not Stale

Mr. Cooper argues that the information from DPD-1—specifically, that he saw drugs in the Nottingham House in November—is too old ("stale") to justify a search of the home on December 19th. The Government responds that Mr. Cooper was involved in an ongoing and continuous endeavor to manufacture and sell drugs, so the information is "fresh" so long as the endeavor continues.

Information in an affidavit for a warrant must be "closely related to the time of the issuance of the warrant as to justify a finding of probable cause at that time." *Sgro v. United States*, 287 U.S. 206, 210 (1932). When the information in an affidavit becomes too old—"stale"—then that information may no longer support the determination of probable cause. *See United States v. Frechette*, 583 F.3d 374, 377–78 (6th Cir. 2009) (citing *United States v. Spikes*, 158 F. 3d 913, 923 (6th Cir. 1998)).

There is no bright line after which information is considered too old, rather, the freshness of information relates to the specifics of the alleged crime. Magistrates must consider a variety of factors, such as "the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), [and] the place to be searched (mere criminal forum of convenience or secure operational base?)." *United States v. Hammond*, 351 F.3d 765, 771–72 (6th Cir. 2003) (quoting *United States v. Greene*, 250 F.3d 471, 480–81 (6th Cir. 2001).

Mr. Cooper argues that warrants related to drug sales require fresh, contemporaneous information, "because drugs are usually sold and consumed in prompt fashion." ECF No. 16, PageID.53 (citing *Frechette*, 583 F.3d at 378). Mr. Cooper says that, because of this, "there is no reason to believe that drugs or any other contraband would be in the residence [several weeks] after the alleged observation." ECF No. 16, PageID.53.

But the Government included facts in the affidavit suggesting that Mr. Cooper was involved in a "continual and ongoing" operation to sell drugs. Consequently, there was reason to believe that, *because* drugs are sold "in prompt fashion," it is necessary for them to be replenished in similarly prompt fashion, and that, DPD-1's information from some time in November that there was crack at the Nottingham house was not stale as of the search date, where the totality of circumstances present an on-

going and continual operation and connection between Mr. Cooper's residence and the Berkshire house where the drugs were being sold. *See United States v. McCoy*, 905 F.3d 409, 417 (6th Cir. 2018) ("Evidence of a defendant's ongoing course of unlawful conduct may make it reasonable to conclude that he keeps evidence of his illegal scheme in his home."); *United States v. Hammond*, 351 F.3d 765, 772 (6th Cir. 2003) (Five month old tip that "dope" was on a property was not stale because "the crime of drug trafficking is ongoing, the defendant's location is established, the drugs were likely to be there for an indefinite period of time, and the place to be searched constituted a secure operational base.").

Lastly, it is significant that the affidavit did not focus only on drugs and drug trafficking, but also illegal possession of weapons. The warrants were issued to look for weapons kept by Mr. Cooper, who is prohibited from possessing guns. Unlike drugs, a gun "commonly remains in a person's possession" according to the Government. ECF No. 18, PageID.97. The Court is inclined to agree, especially when the facts suggest possession of a firearm is needed for protection or intimidation of others in connection with drug trafficking, rather than in connection with a firearms selling operation.

    **c.   There Was Sufficient Probable Cause to Search the Nottingham House, so the Good Faith Exception Does Not Apply**

The Good Faith Exception only examines the actions of the officers carrying out a facially deficient warrant. Because there was adequate probable cause to support the warrant, the Court does not need to apply the Good Faith Exception; officers carried out a lawfully issued and adequate search warrant.

**V. Conclusion**

For all of the above reasons, Defendant's Motion to Suppress Evidence (ECF No. 16) is hereby **DENIED**.

It is so **ORDERED**.

DATED this May 24, 2019.

BY THE COURT:

/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, May 24, 2019, by electronic and/or ordinary mail.

S/A. Chubb
Case Manager and Deputy Clerk