**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

UNITED STATES OF AMERICA,              Criminal Number 19-20015

    Plaintiff,              Hon. Terrence G. Berg

v.

OMAR COOPER,

    Defendant.

_____/

**United States' Response Opposing
the Defendant's Motion for Compassionate Release**

The defendant, Omar Cooper, motioned this Court after serving just

4 months of a 24-month sentence for illegally possessing firearms. And

this wasn't his first felony conviction: In 2000, Cooper was convicted of

fleeing and eluding police and, in 2004, of carrying a concealed firearm.

He has nonetheless filed a motion for compassionate release. Cooper is

ineligible for compassionate release because he did not exhaust the

administrative process. However, even if he was eligible for

consideration, his dangerousness and the § 3553(a) factors – especially

his (1) dangerous combination of firearms and drug trafficking, (2)

1

dubious medical decisions, and (3) limited amount of time served – do not warrant this relief.

## Background

### *Recapping the Offense Conduct*

On December 19, 2018, agents executed federal search warrants at two residences occupied or utilized by Cooper – Berkshire and Nottingham – based on probable cause that evidence of drug trafficking would be found at each location. (PSR, ¶¶ 10-11).[1] Agents indeed found such evidence. At Berkshire, agents seized three (3) digital scales, baggies of marijuana, and two (2) cell phones. (*Id.*, ¶ 12). At Nottingham, agents seized baggies of marijuana and pills, 11 cell phones, a Glock 23 .40 caliber handgun loaded with 22 rounds, a magazine for the Glock 23 loaded with 13 rounds, 28 rounds of .40 caliber ammunition, a New Frontier Armory .223 caliber AR-15 rifle loaded with 19 rounds, a Bushmaster .223 caliber AR-15 rifle loaded with 30 rounds, 3 AR-15 magazines loaded with a combined total of 66 rounds, 14 rounds of .223 caliber ammunition, and $1,100 in cash. (*Id.*, ¶ 13). In total, agents seized 224 rounds of ammunition from

---

[1] The December 13, 2019 revised PSR is referenced herein.

Nottingham. (*Id.*). Cooper also admitted to cooking crack cocaine, selling crack cocaine, and possessing the Glock 23 and both AR-15 rifles. (*Id.*, ¶ 12).

### Indictment, Conviction, and Sentencing

A federal grand jury indicted Cooper on two counts of felon in possession of a firearm. (R.10: Indictment). He eventually pleaded guilty to Count One (Glock 23) and admitted to possessing both AR-15 rifles in the factual basis, and as relevant conduct, in a Rule 11 Plea Agreement. (R.25: Plea Agreement, 134-37). Cooper was held accountable for possessing three (3) firearms, each capable of accepting high capacity magazines. (PSR, ¶ 15). His guidelines were 30-37 months. (*Id.*, ¶ 64). After considering all of the § 3553(a) factors, this Court sentenced Cooper to 24 months in prison. (R.30: Judgment, 182). Cooper began serving that prison sentence on March 3, 2020. (BOP Inmate Data, attached as **Exhibit 1**). His projected release date is November 13, 2021. (*Id.*). Accordingly, as of July 24, 2020, he has served less than 25% of his prison term. Cooper is serving his sentence at FCI Morgantown, a [BOP facility with zero (0) confirmed Covid-19 cases](#).

*The Basis for Release Alleged in Cooper's Administrative Process is Different than His Instant Motion*

In his Administrative Request, Cooper asked the Warden to consider high blood pressure and borderline diabetes. *See* R.32-2: Administrative Request, 209. Cooper's motion asks the Court to consider hypertension (aka high blood pressure), obesity, race, and age. *See* R.32: Motion, 198-201.

*Cooper Shuns BOP Medical Professionals' Efforts to Manage His Hypertension and Then Cites Hypertension as His Basis for Compassionate Release*

Cooper reported that he was diagnosed with hypertension at 34 years of age. (BOP Clinical Encounter at 1, attached as **Exhibit 2**). On March 11, 2020, BOP diagnosed Cooper with essential (primary) hypertension, describing it as "uncontrolled, non complaint," because he "has not taken his medication." (*Id.* at 1-2). On the same day, BOP explained to Cooper the "long term complication of uncontrolled" hypertension. (*Id.* at 4). BOP has measured Cooper's blood pressure no less than sixteen (16) times. (BOP Vitals at 2-3, attached as **Exhibit 3**). That figure excludes the eight (8) scheduled blood pressure tests in late-March 2020 where Cooper was a "No Show." (*Id.* at 3).

4

*Cooper Has Made Other Dubious Medical Decisions, Including Ignoring*
*this Court's Recommendation that He Participate in RDAP*

Despite a long history of marijuana and cocaine use, including

testing positive for cocaine three times during the pendency of this case,

Cooper has never participated in substance abuse treatment. (PSR, ¶¶

50-53). At sentencing, this Court announced its recommendation to

BOP that Cooper "participate in the Residential Drug Abuse Program."

(R.30: Judgment, 182). BOP documented that Cooper "has been

recommended for RDAP, and in [sic] encouraged to participate and

complete this program." (BOP Summary Reentry Plan Progress Report

at 1, attached as **Exhibit 4**). On March 16, 2020 – thirteen days into his

BOP sentence – Cooper informed BOP that he has "no interest" in a

drug abuse program, a position that he also held before sentencing. (*Id.*

at 2; PSR ¶ 53). On March 12, 2020, Cooper refused the influenza

vaccine. (BOP Influenza Vaccine Consent, attached as **Exhibit 5**).

*Despite Cooper's Medical Decisions, BOP Medical Professionals' Still*
*Find Him Fit for any Work Assignment*

BOP concluded that there are no medical or physical conditions that

preclude Cooper from work. (BOP Summary Reentry Plan Progress

Report at 2, attached as **Exhibit 4**). Cooper's work assignment, as of

April 15, 2020, was unit wheelchair pusher. (*Id*. at 1).

*Cooper is Not Ready for Release*

As of April 15, 2020, Cooper still had an outstanding warrant

relating to a 2017 charge. (*Id*.).

**Argument**

I.   **The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

    A.   **The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's

spread within its facilities. *Wilson v. Williams*, ___ F.3d ___, No. 20-

3447, 2020 WL 3056217, at *2 (6th Cir. June 9, 2020). For over almost a

decade, the Bureau of Prisons has maintained a detailed protocol for

responding to a pandemic. Consistent with that protocol, the Bureau of

Prisons began planning for Covid-19 in January 2020. *Wilson*, 2020 WL

3056217, at *2.

On March 13, 2020, the Bureau of Prisons began modifying its

operations to implement its Covid-19 Action Plan and minimize the risk

of Covid-19 transmission into and inside its facilities. *Id*.; *see* BOP

Covid-19 Modified Operations Website. Since then, as the worldwide

6

crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 2020 WL 3056217, at *2. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* [BOP FAQs: Correcting Myths and Misinformation](). Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if performing essential service. *Wilson*, 2020 WL 3056217, at *2. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. *Id.* But to ensure that relationships and communication are maintained throughout this

disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

### B. The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the

8

ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 7,126 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Sixth Circuit recently stressed, these efforts show that "[t]he system is working as it should": "A policy problem appeared, and policy solutions emerged." *United States v. Alam*, ___ F.3d ___, No. 20-1298, 2020 WL 2845694, at *5 (6th Cir. June 2, 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

1.) Each inmate's age and vulnerability to Covid-19;

2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and

9

> 3.) Whether the inmate's release into home confinement would risk public safety.

([03-26-2020 Directive to BOP](); [04-03-2020 Directive to BOP]()). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 2020 WL 3056217, at *11.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious

10

offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 2020 WL 3056217, at *11, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now

11

and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18-20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II. The Court should deny Cooper's motion for compassionate release.

Cooper's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529

F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, ___F.3d ___, No. 20-1298, 2020 WL 2845694, at *1 (6th Cir. June 2, 2020). And as the Sixth Circuit recently held, this statutory exhaustion requirement is mandatory. *Alam*, 2020 WL 2845694, at *1–*4.

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2),

compliance with the policy statements incorporated by § 3582(c)(1)(A) is

mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United*

*States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a

defendant must have a medical condition, age-related issue, family

circumstance, or other reason that satisfies the criteria in USSG

§ 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety

of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, a

district court may not grant the motion unless the factors in 18 U.S.C.

§ 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As

at sentencing, those factors require the district court to consider the

defendant's history and characteristics, the seriousness of the offense,

the need to promote respect for the law and provide just punishment for

the offense, general and specific deterrence, and the protection of the

public. 18 U.S.C. § 3553(a).

## A.    Binding authority prohibits the Court from granting release, because Cooper has not satisfied the statutory exhaustion requirement.

The Court must dismiss Cooper's motion, because he has not

satisfied the exhaustion requirement for compassionate release under

14

18 U.S.C. § 3582(c)(1)(A). Until recently, only the Bureau of Prisons could move for compassionate release. The First Step Act of 2018 amended the statute, permitting defendants to move for it too. First Step Act § 603(b), Pub. L. No. 115-319, 132 Stat. 5194, 5239 (Dec. 21, 2018).

But the provision permitting a defendant-initiated motion includes an exhaustion requirement. *Id.* A district court may not grant a defendant's motion for compassionate release unless the defendant files it "after" the earlier of (1) the defendant "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or (2) "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, ___F.3d ___, No. 20-1298, 2020 WL 2845694, at *2 (6th Cir. June 2, 2020). As the Sixth Circuit recently held in *Alam*, this statutory exhaustion requirement is "a mandatory condition" that "must be enforced" when the government raises it. *Id.* at *1–*4; *accord United States v. Raia*, 954 F.3d 594, 595–97 (3d Cir. 2020).

Section 3582(c)(1)(A) also means that an inmate may not move for compassionate release on a different basis than what he raised during the administrative process. The whole point of § 3582(c)(1)(A)'s exhaustion requirement is to ensure that the Bureau of Prisons has the opportunity to evaluate and consider an inmate's request first, while allowing the inmate to seek relief in court if the Bureau of Prisons denies or fails to act upon the request. *Alam*, 2020 WL 2845694, at \*4. So when "the factual basis in the administrative request and the motion before the court are different, a defendant does not satisfy the exhaustion requirement because he does not give the BOP an opportunity to act on the request before [he] brings his request to the courts." *United States v. Asmar*, No. 18-20668, Order at 7–8 (E.D. Mich. June 5, 2020); *accord United States v. Mogavero*, No. 15-00074, 2020 WL 1853754, at \*2 (D. Nev. Apr. 13, 2020) ("Proper exhaustion necessarily requires the inmate to present the same factual basis for the compassionate-release request to the warden."); *United States v. Jenkins*, 2020 WL 1872568, at \*1 (D. Neb. Apr. 14, 2020); *United States v. Valenta*, 2020 WL 1689786, at \*1 (W.D. Pa. Apr. 7, 2020). An inmate seeking relief based on Covid-19 must first make *that* request to the

Bureau of Prisons before seeking relief in court. *See Alam*, 2020 WL 2845694, at *4 (emphasizing the claim-specific nature of exhaustion).

Cooper did not comply with § 3582(c)(1)(A)'s mandatory exhaustion requirement. Specifically, he moved for compassionate release on a different basis than what he raised during the administrative process. Cooper's motion for compassionate release should therefore be dismissed for failure to exhaust. *Alam*, 2020 WL 2845694, at *5.

## B. Cooper is not eligible for compassionate release under the mandatory criteria in USSG § 1B1.13.

Even if Cooper had exhausted his administrative remedies, compassionate release would be improper. Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy

17

statements mirrors the language governing sentence reductions under
18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare*
§ 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same
language in the same statute, it must be interpreted in the same way.
*Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing
Commission's restraints "on a district court's sentence-reduction
authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711
(6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could
move for compassionate release under § 3582(c)(1)(A). It did not amend
the substantive requirements for release. *United States v. Saldana*, No.
19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United
States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala.
Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of
non-dangerous defendants who are most in need. That policy statement
limits "extraordinary and compelling reasons" to four categories: (1) the
inmate's medical condition; (2) the inmate's age; (3) the inmate's family
circumstances; and (4) other reasons "[a]s determined by the Director of

the Bureau of Prisons," which the Bureau of Prisons has set forth in

[Program Statement 5050.50.](#) USSG § 1B1.13 cmt. n.1.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Cooper and other inmates. *See Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2, *8 (6th Cir. June 9, 2020). Thus, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 2020 WL 3056217, at *11.

Covid-19 is a new disease. Currently there are limited data and information about the impact of underlying medical conditions and whether they increase the risk for severe illness from COVID-19, and courts have distinguished the relevance of health conditions correlated with Covid-19 from health conditions causing Covid-19. *See, e.g., United States v. Attisha*, No. 18-20668, Order at 6 (E.D. Mich. June 3, 2020).

Cooper's medical records confirm that he is obese, with a BMI of 40.9,[2] which the CDC has identified as a risk factor for Covid-19. Given the heightened risk that Covid-19 poses to someone with obesity, Cooper has satisfied the first eligibility threshold for compassionate release during the pandemic. *See* USSG § 1B1.13(1)(A) & cmt. n.1(A).[3]

But, Cooper remains ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." It thus prohibits the release of violent offenders, including most drug dealers. *See United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010); *United*

---

[2] BOP most recent measurements show Cooper standing 6'1" and weighing 304 pounds. (BOP Vitals at 4, attached as **Exhibit 3**). As such, the CDC's Adult BMI Calculator result is 40.9.

[3] The CDC believes that people with hypertension, or high blood pressure, "**might be at an increased risk** for severe illness from COVID-19." More specifically, studies have linked hypertension to Covid-19 by correlation (aka comorbidity), but not by causation. *See* "Hypertension and COVID-19," American Journal of Hypertension; A statement from the International Society of Hypertension on COVID-19. Although Cooper's motion lists his race (black) and age (40) as justifying his release, the CDC does not find race (of any type) as placing a person "at increased risk of severe illness from COVID-19" or that a person of a certain race "might be at an increased risk for severe illness from COVID-19"

*States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020). It also bars the release of many other defendants. An evaluation of dangerousness under § 3142(g) requires a comprehensive view of community safety—"a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam). So even many "non-violent" offenders— such as those who have been involved in serial or significant fraud schemes—may not be released under § 3582(c)(1)(A). USSG § 1B1.13(2).

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. There are real risks to public safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

21

Because Cooper's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A). Cooper admitted to cooking and selling crack cocaine *and* possessed a handgun, two AR-15 rifles, and an unusually high (224) rounds of ammunition at his residence. On every day that Cooper possessed a firearm as a felon, and despite never being caught (except for one day), he demonstrated an unwillingness to comply with laws meant to protect the public and, as a result, placed the public in danger. *See Scarborough v. United States*, 431 U.S. 563, 572 (1977) (citations omitted) (In promulgating 18 U.S.C. § 922, Congress sought to "keep guns out of the hands of those who have demonstrated that 'they may not be trusted to possess a firearm without becoming a threat to society.'"). But Cooper went much further. He combined drugs with firearms and a stockpile of ammunition that could easily support a prolonged, dangerous gunfight to protect his drugs and drug proceeds.

Cooper is not eligible for compassionate release.

### C.     The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not

entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020) ("The § 3553(a) factors . . . weigh against his request for compassionate release."); *United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Cooper eligible for compassionate release, the § 3553(a) factors should still disqualify him.

As of July 24, 2020, Cooper has served less than 25% of his prison term. Releasing him after serving such little time would not "reflect the seriousness of the offense, [] promote respect for the law, and [] provide just punishment for the offense." *See United States v. Kincaid*, 805 F.

23

App'x 394, 395 (6th Cir. 2020) (noting that it was not even "a close question" that a district court properly denied compassionate release on the basis that the defendant "had served only a fraction of her sentence," there roughly 15%).

The "history and characteristics of the defendant" also weigh heavily against release. Cooper's tendency to make dubious medical decisions despite BOP's available services – not managing his hypertension, refusing the influenza vaccine, and ignoring this Court's recommendation that he participate in RDAP – means he is more likely than most people to expose himself and innocent people to Covid-19 if released. Whether it be (1) using cocaine again (after, to date, refusing any form of BOP treatment) and seeking to fund that addition; (2) cooking and distributing crack cocaine; (3) possessing firearms and ammunition to facilitate drug trafficking; or (4) continuing to make dubious health decisions thereby exposing himself and innocent people to Covid-19, both Cooper and the public would be placed at unnecessary risk that could be mitigated by simply denying his motion for an aggressive reduction in his sentence.

## III.   If the Court were to grant Cooper's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Cooper's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

### Conclusion

Cooper's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

*/s/Paul A. Kuebler*
PAUL A. KUEBLER (NY 4268561)
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9641
Dated: July 24, 2020       paul.kuebler@usdoj.gov

<u>**Certificate of Service**</u>

I certify that on July 24, 2020, I electronically filed the foregoing using with the Clerk of the Court of the Eastern District of Michigan using the ECF system, and a copy will be generated by the ECF system and sent to the Attorney(s) of Record.

<u>*/s/Paul A. Kuebler*</u>
PAUL A. KUEBLER (NY 4268561)
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9641
paul.kuebler@usdoj.gov

26